**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**
**UNDER SEAL**

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

**CASE NO.:**  **CV 15-02718 SJO (AJWx)**          **DATE:**  **May 6, 2015**

**TITLE:**      **Hand & Nail Harmony, Inc. et al v. International Nail Co. et al**

========================================================================
**PRESENT:  THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE**

Victor Paul Cruz                            Not Present
Courtroom Clerk                          Court Reporter

**COUNSEL PRESENT FOR PLAINTIFFS:**        **COUNSEL PRESENT FOR DEFENDANTS:**

Not Present                                  Not Present

========================================================================
**PROCEEDINGS (In Chambers - UNDER SEAL): ORDER GRANTING PLAINTIFF'S EX PARTE APPLICATION FOR: (I) TEMPORARY RESTRAINING ORDER; (II) ORDER TO SHOW CAUSE REGARDING ENTRY OF PRELIMINARY INJUNCTION; AND (III) LEAVE FOR ALTERNATIVE SERVICE**

This matter comes before the Court on Plaintiffs Hand & Nail Harmony, Inc. ("Harmony") and Nail Alliance LLC's ("Nail Alliance") (together, "Plaintiffs") *Ex Parte* Application for:  (I) Temporary Restraining Order ("TRO"); (II) Order to Show Cause Regarding Entry of Preliminary Injunction; and (III) Leave for Alternative Service ("Application"), filed under seal on April 13, 2015.  For the following reasons, the Court **GRANTS** the Application.

I.      FACTUAL AND PROCEDURAL BACKGROUND

In the Complaint filed concurrently with the Application, Plaintiffs allege the following.  Plaintiff Harmony creates, promotes, and sells high-quality nail care products and nail care accessories, including soak-off gel polishes ("Harmony Products") under the brand name "Gelish" and other trademarks ("Harmony Marks").  (*See* Compl. ¶¶ 3, 24-26.)  Plaintiff Nail Alliance owns the Harmony Marks, and exclusively licenses the Harmony Marks to Harmony.  (Compl. ¶¶ 10, 29.) The Harmony Marks are protected by multiple federal trademark registrations, as well as California common law, and the brand name of each GELISH color is protected under the Lanham Act. (Compl. ¶¶ 25, Ex. A, 27-28.)  Further, the photographs of Harmony Products and product packaging used on Harmony's website, as well as other promotional material distributed by Harmony (the "Harmony Works"), are subject to United States Copyright Registrations and protected under federal law.  (Compl. ¶¶ 36-38, Ex. B.)

Using a limited number of qualified distributors, Harmony sells Harmony Products to salons and boutiques throughout the world.  (Compl. ¶ 8.)    Plaintiffs carefully monitor and police the use of the Harmony Marks and Harmony Products, and Harmony's qualified distributors are contractually obligated to exclusively sell Harmony Products to salons and boutiques that are properly trained to apply its products. (Compl. ¶¶ 9, 32.)  Harmony's distributor agreements also inform authorized

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**
**UNDER SEAL**

**CASE NO.:**  **CV 15-02718 SJO (AJWx)**          **DATE:** **May 6, 2015**

distributors of Plaintiffs' policy against diversion and expressly prohibit the sale of Harmony Products to unauthorized distributors, re-distributors, and diverters, as well as the online sale of Harmony Products.[1]  (Compl. ¶ 40.)  This is imperative because proper application of Gelish brand gel polish requires application of base coat product, polish product, and top coat product, as well as irradiation of each coat with ultraviolet light.  (Compl. ¶ 9.)  Application of Harmony Products by a person without proper training and equipment yields uncured and marred finishes. (Compl. ¶ 9.)  Further, removal of the cured finishes by a person without proper training can take excessive time, aggravate the user, or result in bacterial infections of the nail bed that cause painful and permanent injuries, all of which injure Harmony's goodwill and reduce Harmony's sales to salon customers.  (Compl. ¶¶ 9, 39.)

Harmony uses a number of domain names, including www.gelish.com and www.nailharmony.com, to promote the Harmony Products.  (Compl. ¶ 3, 35.)  Additionally, other domain names direct traffic to Harmony's domains.  (Compl. ¶ 3.)  At an unspecified time, Defendants International Nail Co. d/b/a Rockstar Nails ("Rockstar") and Does 1 through 10 ("Doe Defendants") (collectively, "Defendants") registered in bad faith the domain name www.harmonygelish.co.uk (the "Domain Name") to improperly associate themselves with Harmony and unlawfully profit at the expense of Harmony.  (Compl. ¶¶ 4, 14, 18, 43.)

Using the Domain Name, Defendants operate a website formed entirely of copyrighted images and trademarks misappropriated from Harmony's website (the "Website") in order to directly compete with Harmony and its authorized distributors.  (Compl. ¶ 4, 18, 49, 51-53, 55.)  The singular purpose of the Website is to sell unauthorized and infringing Harmony products (the "Merchandise") which they knowingly obtained "in violation of [Harmony's] distributor agreements." (Compl. ¶¶ 5, 49, 57.)  In selling the Merchandise, Defendants do not concern themselves with whether a salon or retail customer is trained or qualified to apply Harmony Products to an individual's nails, which in turn harms Harmony's brand and reputation and creates health risks for unsuspecting users of its products.  (Compl. ¶¶ 5, 56.)  Further, Defendants have "undertaken exceptional efforts" to hide their true identities by obliterating the serial numbers from the gel polish bottles sold on the Website so that Plaintiffs cannot determine which of its distributors is providing Harmony Products to Defendants.  (Compl. ¶ 50.)

Plaintiffs also allege the following in information and belief.  Rockstar engaged in bad faith, fraudulent and unlawful conduct by:  (1) registering a domain name comprised of the Harmony Marks; and (2) providing false, inaccurate, or misleading information to its Registrar during the registration of the Domain Name. (Compl. ¶ 18.) Additionally, Rockstar and its owners, operators, and directors used false, inaccurate, or misleading information in order to conceal their  identities

---

[1]  Harmony's distributor agreements prohibit the online sale of Harmony Products precisely to "avoid, *inter alia*, sales to untrained or unskilled salons or individuals, as well as any violation of the Hazardous Materials Transportation Act."  (Compl. ¶¶ 56-57.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**
**UNDER SEAL**

**CASE NO.:  CV 15-02718 SJO (AJWx)**           **DATE:  May 6, 2015**

while conducting their illegal activities using the Domain Name and Website.  (Compl. ¶¶ 19, 50.) Finally, Doe Defendants, whose identities are unknown to Plaintiffs, have distributed, supplied, or sold the allegedly infringing Merchandise in violation of the law.  (Compl. ¶ 20.)  Plaintiffs maintain that there is no legitimate business purpose to Defendants' Website because it is designed exclusively to facilitate the "unlawful advertisement and sale of Infringing Merchandise."  (Compl. ¶¶ 50, 59-60.)

Plaintiffs filed the instant lawsuit on April 13, 2015.  In the Complaint, Plaintiffs bring six causes of action for:  (1) cybersquatting pursuant to § 43(d) of the Lanham Act, 15 U.S.C. § 1125 (Compl. ¶¶ 62-69); (2) trademark infringement pursuant to § 32 of the Lanham Act, 15 U.S.C. § 1114 (Compl. ¶¶ 70-76); (3) trademark infringement pursuant to § 42 of the Lanham Act, 15 U.S.C. § 1125 (Compl. ¶¶ 77-83); (4) copyright infringement, 17 U.S.C. §§ 501 *et seq.* (Compl. ¶¶ 84-94); (5) intentional interference with contractual relations or prospective business advantage (Compl. ¶¶ 95-105); and (6) unfair competition in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*  (Compl. ¶¶ 106-11.)

In the Application filed under seal, Plaintiffs seek a TRO and Order to Show Cause ("OSC") for a preliminary injunction: (1) enjoining Defendants' trademark and copyright infringement, including (a) directing Defendants and all those in active concert or participation with them (the "Enjoined Parties") to suspend any further use of the Domain Name, (b) ordering the Enjoined Parties to immediately cease the use of Harmony's copyrighted works, and (c) requiring the Enjoined Defendants to immediately cease the sale of Harmony products without serial batch codes and the unlawful shipment of flammable products through the United States Post Office; and (2) directing PayPal, Inc. ("PayPal") and Stamps.com, Inc. ("Stamps.com") to freeze and suspend all accounts relating to the Domain Name and hold as fiduciaries all monies tied to Defendants. (Pls.' Mem. of P. & A. in Supp. Of [Appl.] ("Mem.") 2.)   Additionally, Plaintiffs request that the Court grant them leave to serve copies of the documents associated with the Plaintiffs' Application and Complaint, including any Court Order, on Defendants by mailing and emailing these documents to two addresses and an email address which have been shown to be associated with Defendants. (Mem. 3; [Proposed] Temporary Restraining Order, Order to Show Cause Regarding Preliminary Injunction, and Order for Leave for Alternative Service ("Proposed Order") 5.)

II.     DISCUSSION

        A.     Notice

As a general matter, Rule 65 of the Federal Rules of Civil Procedure ("Rule 65") and Local Rule 7-19.1 (the "Local Rule") require that a party filing an *ex parte* application for a TRO give the opposing party notice of the application.  *See* Fed. R. Civ. P. 65(b)(1); L.R. 7-19.1.  Specifically, Rule 65 provides that the courts may only issue TROs without written or oral notice to the opposing party or its attorney if: "(A) specific facts . . . clearly show that immediate and irreparable

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**
**UNDER SEAL**

**CASE NO.:**  CV 15-02718 SJO (AJWx)          **DATE:**  May 6, 2015

injury, loss, or damage will result to the movant before the adverse party can be heard in opposition . . . and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required."  Fed. R. Civ. P. 65(b)(1).  The Local Rule, meanwhile, provides that "[i]t shall be the duty of the attorney [filing for *ex parte* relief] to (a) make reasonable, good faith efforts orally to advise counsel . . . of the date and substance of the proposed ex parte application and (b) to advise the Court in writing and under oath of efforts to contact other counsel."  L.R. 7-19.1.  However, "[i]f the judge to whom the application is made finds that the interest of justice requires that the ex parte application be heard without notice (which in the instance of a TRO means that the requisite showing under [Rule 65] has been made), the judge may waive the notice requirement."  L.R. 7-19.2.

Rule 65's restrictions on the issuance of *ex parte* TROs "reflect the fact that [federal] jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted."  *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.,* 415 U.S. 423, 439 (1974).  However, in situations "where notice could have been given to the adverse party, courts have recognized 'a very narrow band of cases in which ex parte orders are proper because notice to the defendant would render fruitless the further prosecution of the action.'"  *Reno Air Racing Ass'n, Inc. v. McCord,* 452 F.3d 1126, 1131 (9th Cir. 2006) (quoting *Am. Can Co. v. Mansukhani,* 742 F.2d 314, 322 (7th Cir. 1984)).  "In the trademark arena, such cases include situations where an alleged infringer is likely to dispose of the infringing goods before the hearing."  *Reno,* 452 F.3d at 1131 (citing *In the Matter of Vuitton et Fils S.A.,* 606 F.2d 1, 5 (2d Cir. 1979)); *see also Columbia Pictures Indus., Inc. v. Jasso,* 927 F. Supp. 1075, 1077 (N.D. Ill. 1996) ("[P]roceedings against those who deliberately traffic in infringing merchandise are often rendered useless if notice is given to the infringers before temporary injunctive and impoundment relief can be granted").  Consequently, courts have granted *ex parte* TROs in trademark infringement cases where there was a risk that defendants would dispose of or hide assets derived from infringing activities before the court could issue an order providing injunctive relief.  *See, e.g., Bulgari v. S.p.A. v. P'ships & Unincorporated Assocs. Identified on Schedule "A",* No. CV 14-04819 RAG, 2014 WL 3749132, at *1-2 (N.D. Ill. July 18, 2014)[2]; *Chanel, Inc. v. The P'Ships or Unincorporated Assocs. Identified on Schedule "A",* No. CV 13-02645 IRS, 2013 WL 3439912, at *1 (N.D. Cal. July 1, 2013).[3]  Overall, *ex parte* TROs "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer."  *Granny Goose,* 415 U.S. at 439 (footnote omitted).

---

[2]   *See also Bulgari,* No. CV 14-04819 RAG, ECF No. 8 (motion to seal), ECF No. 9 (memorandum in support of, among other things, TRO and motion to seal) 30-32, ECF No. 33 (unsealed TRO).

[3]   *See also Chanel,* No. CV 13-02645 IRS, ECF No. 3 (memorandum in support of motion for TRO) 2, 22.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**
**UNDER SEAL**

**CASE NO.:**  **CV 15-02718 SJO (AJWx)**          **DATE:**  **May 6, 2015**

Here, Defendants are unknown to Plaintiffs, are not authorized or licensed to distribute Harmony Products, and have endeavored to prevent Harmony from determining the source Defendants are using to acquire Harmony Products by obliterating the batch codes etched into Harmony's gel polish bottles.  (Decl. of Danny Haile ("Haile Decl.") ¶¶ 16-17, 20; Decl. of Todd M. Malynn ("Malynn Decl.") ¶ 8.)  Further, although Rockstar's Domain Name is registered to International Nail Co. which, in turn has an  address of 1223 S. 12th Street, Bismarck, North Dakota 58501 (the "Bismarck Address"), neither Rockstar nor International Nail Co. are business entities under North Dakota law or registered at the Bismarck Address.  (Malynn Decl. ¶ 6.)

In an effort to discover the true location and identity of Defendants, Plaintiffs retained an investigator from AED Investigations and Brand Security Corp. ("Investigator") to purchase allegedly infringing Merchandise from Defendants' website. (Malynn Decl. ¶ 7; Haile Decl. ¶ 19; Decl. of Erik Fernandez ("Fernandez Decl.") ¶¶ 1-2.)  Although the goods purchased by the Investigator had a return address of "Rockstar Nails, 2118 Wilshire Blvd Unit 743, Santa Monica, CA 90403-5704," (the "Santa Monica Address") and Defendants' website states that its use "shall be governed in all respects by the laws of the state of California," neither Rockstar Nails nor International Nail Co. is listed as an entity licensed to conduct business in California on the Secretary of State database.  (Fernandez Decl. ¶ 5, Malynn Decl. ¶ 10.) Based on enigmatic circumstances surrounding Defendants' identities, location, and licensure, Plaintiffs maintain that "it appears that the individuals who own and operate Rockstar are purposefully trying to hide their identities and avoid responsibility for their wrongful conduct," including their infringement of Plaintiffs' copyrights and trademarks ("Intellectual Property"). (Malynn Decl. ¶¶ 3, 10; Haile Decl. ¶¶ 4, 7, 23.)  Finally, Plaintiffs' counsel, Todd Malynn ("Malynn"), (Malynn Decl. ¶ 1), has certified in writing the reasons why notice should not be required.  *See* Fed. R. Civ. P. 65(b)(1)(B). Specifically, Malynn maintains that "[t]here is a real and substantial risk that with advanced notification, Defendants would dissipate their assets and transfer the offending website and funds in related PayPal and Stamps.com accounts outside of this Court's jurisdiction."  (Malynn Decl. ¶ 11.)  Malynn contends that such a risk is especially acute here because "Defendants operate an online enterprise, and their assets could be moved outside of this Court's jurisdiction within a matter of hours, frustrating any ability of the Court to maintain the status quo and provide the relief . . . prayed for by Plaintiffs."  (Malynn Decl. ¶ 11.)

Based on the foregoing, the Court finds that Plaintiffs have alleged specific facts which "clearly show that immediate and irreparable injury, loss, or damage will result" to Plaintiffs if Defendant is provided notice prior to the issuance of a TRO. *See* Fed. R. Civ. P. 65(b)(1); *Columbia Pictures,* 927 F. Supp. at 1077.  Despite their associations with the Bismark and Santa Monica Addresses, Defendants are not registered business entities in either North Dakota or California. (Malynn Decl. ¶¶ 6, 10.)   Further, Defendants have purposefully endeavored to prevent Harmony from discovering the source they are using to acquire Harmony Products by obliterating the batch codes etched onto Harmony's products.  (Haile Decl. ¶ 20; Malynn Decl. ¶ 8.)  Finally, in light of the deceptive nature of Defendants' online business, there is a genuine risk that alerting Defendants

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**
**UNDER SEAL**

**CASE NO.:**  <u>CV 15-02718 SJO (AJWx)</u>          **DATE:**  <u>May 6, 2015</u>

of Plaintiffs' Complaint and Application before an Order issues may cause Defendants to transfer their business and assets out of this jurisdiction[4] and thereby frustrate this Court's ability to grant permanent relief to Plaintiffs, including an accounting of profits under the Lanham Act.  (Malynn Decl. ¶ 11.)  *See Reebok Int'l, Ltd. v. Marnatech Enters., Inc.,* 970 F.2d 552, 559 (9th Cir. 1992) ("Because the Lanham Act authorizes the district court to grant [the plaintiff] an accounting of [the defendant's] profits as a form of final equitable relief, the district court had the inherent power to freeze [the defendant's] assets in order to ensure the availability of that final relief.").  Under these circumstances, the Court finds that notice to Defendants is not required.

B.    Personal Jurisdiction

Due to the ambiguity surrounding Defendants' location, (Malynn Decl. ¶ 7; Haile Decl. ¶ 19), and because "[a] district court must have personal jurisdiction over a party before it can enjoin its actions," *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 711 n.1 (1982), before turning to the merits of Plaintiffs' Application, the Court addresses the issue of personal jurisdiction. As a general matter, "[t]he plaintiff bears the burden of establishing that the court has personal jurisdiction," *Fields v. Sedgwick Associated Risks, Ltd.,* 796 F.2d 299, 301 (9th Cir. 1986); *see also Ziegler v. Indian River Cnty.,* 64 F.3d 470, 473 (9th Cir. 1995) (citation omitted), and courts accept allegations in the complaint as true for purposes of determining jurisdiction.  *Fields,* 796 F.2d at 301 (citing *Pac. Atl. Trading Co. v. M/V Main Express*, 758 F.2d 1325, 1327 (9th Cir. 1985)).

Here, the Complaint alleges that although Defendants' Domain Name is registered to the Bismarck Address neither Rockstar Nails nor International Nail Co. is registered to conduct business in North Dakota or organized under its laws.  (Compl. ¶¶ 14-15.)  Further, when Plaintiffs retained an Investigator to purchase Merchandise sold on the Website, the purchased goods included a Santa Monica, California return address, and the terms and conditions on Defendants' website purport to be "governed by the laws of the State of California."  (Compl. ¶ 16.)  Based on the foregoing, Plaintiffs allege, on information and belief,[5] that "Rockstar is a business entity" that

---

[4]  *See Chanel,* No. CV 13-02645 IRS, ECF No. 3 (memorandum in support of motion for TRO) 2, 22, ECF No. 18 (order granting TRO without notice upon finding that the plaintiff had satisfied the requirements under Rule 65) 3.

[5]  For allegations based upon "information and belief" to be facially plausible, either the facts on which the allegations are based must be "peculiarly within the possession and control of the defendant," or the belief must be based on factual information that makes the inference of culpability plausible."  *Vavak v. Abbott Labs., Inc.,* No. CV 10–01995 JVS, 2011 WL 10550065, at *2 (C.D. Cal. June 17, 2011) (quoting *Arista Records, LLC v. Doe,* 604 F.3d 110, 120 (2d Cir. 2010)).  Here, because Defendants have apparently undertaken efforts to conceal their identities, the location of the Rockstar business entity is information

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**
**UNDER SEAL**

**CASE NO.:**  <u>CV 15-02718 SJO (AJWx)</u>          **DATE:**  <u>May 6, 2015</u>

"resides and operates within this judicial district in the State of California."  (Compl. ¶¶ 16, 22.)  Because "[a] federal court can exercise general personal jurisdiction as to persons domiciled within the forum state at the time the action is commenced," *Lietzke v. Cnty. of Montgomery,* No. CV 06-01410 ST, 2006 WL 2947118, at *2 (D. Or. Oct. 16, 2006) (citing *Milliken v. Meyer*, 311 U.S. 457 (1940)), such allegations are sufficient to establish personal jurisdiction.

Further, even assuming the Defendants are not California residents, the Court finds that Plaintiffs have sufficiently alleged facts establishing personal jurisdiction for the following reasons. California's long-arm statute "allows courts to exercise personal jurisdiction over defendants to the extent permitted by the Due Process Clause of the United States Constitution." *Harris Rutsky,* 328 F.3d at 1129 (citing Cal. Civ. Proc. Code § 410.10).  Courts may exercise personal jurisdiction over a non-resident defendant if the defendant has "at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'"  *Dole Food Co. v. Watts*, 303 F.3d 1104, 1110-11 (9th Cir. 2002) (citation omitted).  Under the Ninth Circuit's three-prong test, a court may exercise specific personal jurisdiction over a non-resident defendant when:  (1) the non-resident defendant purposefully directs his activities or consummates some transaction with the forum or resident thereof; or performs some act by which he purposefully avails himself of the privileges of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the plaintiff's claim arises out of or relates to the defendant's forum-related activities; and (3) the forum's exercise of jurisdiction comports with fair play and substantial justice.  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (citation omitted).

"In the internet context, the Ninth Circuit utilizes a sliding scale analysis under which 'passive' websites do not create sufficient contacts to establish purposeful availment, whereas interactive websites may create sufficient contacts, depending on how interactive the website is." *Allstar Mktg. Grp., LLC v. Your Store Online, LLC,* 666 F. Supp. 2d 1109, 1121 (citations and quotation marks omitted).  While "'passive' websites . . . merely display information, such as an advertisement . . . 'interactive' websites . . . function for commercial purposes and [allow] users [to] exchange information." *Am. Auto. Ass'n, Inc. v. Darba Enters., Inc. ("AAA"),* No. CV 09-00510 SI, 2009 WL 1066506, at *4 (N.D. Cal. Apr. 21, 2009) (citations omitted).  Thus, "[p]ersonal jurisdiction is appropriate 'when an entity is conducting business over the internet.'" *Id.* (quoting *Stomp, Inc. v. NeatO, LLC*, 61 F. Supp. 2d 1074, 1078 (C.D. Cal. 1999)).

Here, Plaintiffs allege that "Defendants are subject to personal jurisdiction in this judicial district because they direct business activities toward and conduct business with consumers within the State of California . . . through . . . the fully interactive commercial Internet website www.harmonygelish.co.uk." (Compl. ¶ 22.)  Accepting Plaintiffs' allegations as true, *see Fields,*

---

"peculiarly within the possession and control" of Defendants.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**
**UNDER SEAL**

**CASE NO.:  CV 15-02718 SJO (AJWx)**          **DATE:  May 6, 2015**

796 F.2d at 301, the Court finds that Plaintiffs have established that Defendants purposefully availed themselves of the privileges of conducting business in California by directing business toward and conducting business with customers in California via the Website.   *See Schwarzenegger*, 374 F.3d at 802; *Stomp*, 61 F. Supp. 2d at 1078.

Plaintiffs have also established the second prong for personal jurisdiction: that "the claim asserted in the litigation arises out of [the] defendant's forum related activities.'" *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998).  When examining this prong, courts "must determine whether plaintiff would not have been injured but for defendant's forum-related activities." *AAA*, 2009 WL 1066506, at *5 (citing *Panavision*, 141 F.3d at 1322).  Here, Plaintiffs allege that Defendants have used the Website, which advertise the allegedly infringing Merchandise using Harmony's registered copyrights, to conduct business with California consumers. (Compl. ¶¶ 22, 51-52.)  Further, Defendants' Website has harmed Plaintiffs' brands, reputation, and relationships with its authorized distributors and customers by permitting its products to be sold to untrained, unqualified persons, and thereby increasing the risk of customer dismay and injury. (*See* Compl. ¶¶ 5-6, 40.)  Finally, Plaintiffs maintain that by selling the allegedly infringing Merchandise, Defendants are in "direct competition with Plaintiffs and authorized distributors." (Compl. ¶ 55.)  Based on the foregoing, the Court finds that Plaintiffs have established that they would not have been harmed but for Defendants' forum-related activities. *See AAA*, 2009 WL 1066506, at *5.

Finally, the Court finds that the exercise of personal jurisdiction over Defendants would be reasonable based on the factors articulated by the Ninth Circuit in *Panavision*.[6]  Because the burden is on Defendants to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable," *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1487 (9th Cir.1993),[7] and because there is no indication at this time that the exercise of personal jurisdiction over Defendants, who Plaintiffs allege are California residents, (Compl.

---

[6]  Those factors are:  "(1) the extent of a defendant's purposeful interjection; (2) the burden on the defendant in defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum."  *Panavision,* 141 F.3d at 1323 (citing  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-77 (1985)).

[7]  As indicated, Defendants have not received notice of Plaintiffs' Complaint or Application, and therefore have not yet weighed in on the issue of reasonableness.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**
**UNDER SEAL**

**CASE NO.:**  <u>CV 15-02718 SJO (AJWx)</u>          **DATE:**  <u>May 6, 2015</u>

¶¶ 22-23), would be unreasonable, the Court finds that Plaintiffs have established that the Court has personal jurisdiction over Defendants.

    C.    <u>TRO Analysis</u>

TROs are governed by the same standards as preliminary injunctions.  *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  To obtain preliminary injunctive relief, the moving party must show:  (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in favor of the moving party; and (4) that an injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Save Our Sonoran, Inc. v. Flowers,* 408 F.3d 1113, 1120 (9th Cir. 2005).  The Ninth Circuit also employs an alternative, sliding scale test whereby the existence of "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted).  Overall, a restraining order is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.

    1.    <u>Likelihood of Success on the Merits</u>

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter,* 555 U.S. at 9.  As a result, a plaintiff seeking injunctive relief must demonstrate a "likelihood of success on the merits."  *Munaf,* 553 U.S. at 676 (internal quotations marks omitted) (citation omitted).  Such an inquiry, in turn, looks at the "probable outcome [of plaintiff's claim] on the merits."  *Mayo v. U.S. Gov't Printing Office,* 839 F. Supp. 697, 700 (N.D. Cal. 1992).  Here, Plaintiff's request for a TRO centers on its claims for copyright and trademark infringement, cybersquatting, and unfair competition.[8]  (*See generally* Compl.; Mem.)  Thus, the Court must determine whether Plaintiffs are likely to succeed on the merits of these claims.

    a.    <u>Copyright Infringement</u>

---

[8]  Because the injunctive relief Plaintiffs seek in the Application, (*see generally* Proposed Order), is available for (1) trademark infringement, 15 U.S.C. § 1116(a), (2) copyright infringement, 17 U.S.C. § 502, and (3) unfair competition in violation of the UCL, *Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal. 4th 1134, 1144 (2003), the Court limits its analysis to the merits of these claims.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**
**UNDER SEAL**

**CASE NO.:  CV 15-02718 SJO (AJWx)          DATE: May 6, 2015**

"Plaintiffs must satisfy two requirements to present a prima facie case of direct [copyright] infringement:  (1) they must show ownership of the allegedly infringed material and (2) they must demonstrate that the alleged infringers violate[d] at least one exclusive right granted to copyright holders under 17 U.S.C. § 106."  *A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1013 (9th Cir. 2001).   Under 17 U.S.C. § 106, "the owner of copyright . . . has the exclusive right[] to [reproduce] and to authorize [others] . . . to reproduce the copyrighted work in copies." 17 U.S.C. § 106(1).

Harmony's copyright registrations demonstrate that it is owner of the allegedly infringed material. (Haile Decl. ¶ 14; *see generally* Mem. Ex. B ("Copyright Registrations").)  Additionally, Defendants have reproduced dozens of Harmony Works on their Website, (*see* Malynn Decl. ¶ 3; Mem. Ex. C), infringing upon Harmony's exclusive right to reproduce its copyrighted works.   *See* 17 U.S.C. § 106(a).  Thus, Plaintiffs have establish a prima face case of direct copyright infringement. *See Napster, Inc.,* 239 F.3d at 1013.

Notably, "the fair use of a copyrighted work, including . . . copies . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is **not** an infringement of copyright." 17 U.S.C. § 107 (emphasis added); *see also Napster,* 239 F.3d at 1014.   In determining whether an alleged infringer's use of a copyrighted work is "fair use", courts consider:

> (1) [T]he purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

Here, Defendants are using the Harmony Works reproduced on the Website for the commercial purpose of selling allegedly infringing Merchandise outside of Harmony's authorized distributor network.   (*See* Haile Decl. ¶¶ 16, 18, 22-23; Fernandez Decl. ¶¶ 3-5; Malynn Decl. ¶¶ 2-4.) Further, the Website "appears exclusively dedicated to selling Harmony [Products]" because the Website "shows no other competitor's nail care products advertised or offered for sale." (Malynn Decl. ¶ 4.)  Finally, Defendants' use of the Harmony Works to sell unauthorized Harmony Products at the allegedly infringing Domain Name is harming the value of the copyrighted works by:  (1) alienating Harmony's authorized distributors; and (2) increasing the risk that consumers

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**
**UNDER SEAL**

**CASE NO.:  CV 15-02718 SJO (AJWx)          DATE:  May 6, 2015**

will come to associate Harmony products with poor quality or unsafe nail care products.  (*See* Haile Decl. ¶¶ 3, 9-10, 18, 20, 22-23.)   Based on the foregoing, the Court concludes that Defendants' use of the Harmony Works does not constitute "fair use," and that Plaintiffs are likely to succeed on the merits of their copyright infringement claim.  *See Munaf,* 553 U.S. at 676.

        b.   Cybersquatting

"[C]ybersquatting occurs when a person other than the trademark holder registers the domain name of a well known trademark and then attempts to profit from this . . . by using the domain name to divert business from the trademark holder to the domain name holder."  *Bosley Med. Inst., Inc. v. Kremer,* 403 F.3d 672, 680 (9th Cir. 2005) (citing *DaimlerChrysler v. The Net Inc.,* 388 F.3d 201, 204 (6th Cir. 2004)).  "In 1999, Congress passed the Anticybersquatting Consumer Protection Act ('ACPA'), 15 U.S.C. § 1125(d), as an amendment to the Lanham Act to prohibit cybersquatting."  *Bosley,* 403 F.3d at 680.  The ACPA provides that:

> A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person–
>> (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
>> (ii) registers, traffics in, or uses a domain name that–
>>> (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
>>> (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or
>>> (III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

15 U.S.C. § 1125(d)(1)(A).  Thus, under the ACPA, depending on whether the mark is "distinctive" or "famous," a cybersquatter is liable to the owner of a protected mark if the cybersquatter has "a bad faith intent to profit from that mark . . . and registers, traffics in, or uses a domain name" that is:  (1) "identical or confusingly similar" to a distinctive mark; or (2) "identical or confusingly similar to or dilutive" of a famous mark.  *Interstellar Starship Servs., Ltd. v. Epix, Inc.,* 304 F.3d 936, 946 (9th Cir. 2002); 15 U.S.C. § 1125(d)(a)(A).

"A finding of 'bad faith' is an essential prerequisite to finding an ACPA violation."  *Interstellar,* 304 F.3d at 946.  Congress has enumerated nine factors which courts may consider in determining whether a person has a bad faith intent.  *See* 15 U.S.C. § 1125(d)(1)(B)(i).  These include, among

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**
**UNDER SEAL**

**CASE NO.:  CV 15-02718 SJO (AJWx)**          **DATE:  May 6, 2015**

other things:  (1) "the trademark or other intellectual property rights of the person, if any, in the domain name"; (2) "the person's intent to divert consumers from the mark owner's online location to a site . . . that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site"; and (3) "the person's provision of material and misleading false contact information when applying for the registration of the domain name."  15 U.S.C. § 1125(d)(1)(B)(i)(I), (V), (VII). This list of factors is non-exhaustive, and "the most important grounds for finding bad faith are the unique circumstances of the case, which do not fit neatly into the specific factors enumerated by Congress."  *Interstellar,* 304 F.3d at 946-47 (citation and quotation marks omitted).

> i.     Distinctiveness

"Distinctiveness is . . . required to sustain an ACPA claim."  *Lahoti v. VeriCheck, Inc.,* 586 F.3d 1190, 1197 (9th Cir. 2009).  While "[d]eciding whether a mark is distinctive or merely descriptive 'is far from an exact science' . . . the 'primary criterion' for distinguishing between a suggestive and a descriptive mark 'is the imaginativeness involved in the suggestion, that is, how immediate and direct is the thought process from the mark to the particular product.'" *Id.* at 1198 (citing *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 911 (9th Cir. 1995)).  Thus, "[a] mark is suggestive if imagination or a mental leap is required in order to reach a conclusion as to the nature of the product being referenced," *Lahoti,* 586 F.3d at 1197 (citation and quotation marks omitted), but is merely descriptive if it "define[s] a particular characteristic of the product in a way that does not require any exercise of the imagination." *Yellow Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 927 (9th Cir. 2005).

Here, Plaintiffs argue that the Harmony Marks, including Gelish, are distinctive.[9]  (Mem. 16.) Indeed, several of the Harmony Marks are registered with the United States Patent and Trademark Office ("PTO"), (*see generally* Compl. Ex. A ("Trademark Registrations"), and "[r]egistered trademarks are presumed to be distinctive and should be afforded the utmost protection."  *Americana Trading Inc. v. Russ Berrie & Co.,* 966 F.2d 1284, 1287 (9th Cir. 1992) (citation omitted).  Further, the Court finds that those Harmony Marks that are not registered with PTO are distinctive because the marks "Harmony," "Hand & Nail Harmony," and "Gelish," require imagination and a mental leap in order to discern that nature of the product being offered:  soak-off

---

[9]  Although Plaintiffs contend the Harmony marks were "distinctive or famous" at the time the Domain Name was registered, (Mem. 16), because Plaintiffs arguments and allegations track the distinctiveness analysis, (*see generally* Mem.), the Court exclusively examines whether the Harmony Marks are distinctive.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**
**UNDER SEAL**

**CASE NO.:**  <u>CV 15-02718 SJO (AJWx)</u>       **DATE:**  <u>May 6, 2015</u>

gelish polish and nail care accessories.  *See Lahoti,* 586 F.3d at 1197.  This is not a situation
where the mark at issue is merely descriptive, such as a restaurant chain called "Delicious Foods"
or a clothing company called "Ready Wear," *id.,* because there is nothing inherently "harmonious"
about gel polish or other nail care accessories.  Based on the foregoing, the Court finds that the
Harmony Marks are sufficiently distinctive for Plaintiffs to sustain an ACPA claim.  *See id.*

### ii.   <u>Identical or Confusingly Similar Domain Name</u>

"[T]he [Lanham] Act is designed to protect consumers who have formed particular associations
with a mark from buying a competing product using the same or substantially similar mark and to
allow the mark holder to distinguish his product from that of his rivals."  *Bosley,* 403 F.3d at 676
(citing *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 873 (9th Cir. 1999)).  Thus, the Court
must compare "the mark and the allegedly offensive domain name" to determine whether the
Harmony Marks and the Domain Name are identical or confusingly similar.  *See N. Light Tech.
v. Northern Lights Club,* 97 F. Supp. 2d 96, 117 (D. Mass. 2000).

Here, Defendants registered the allegedly infringing Domain Name www.HarmonyGelish.co.uk.
(Compl. ¶ 4.)  This domain name incorporates Plaintiffs' registered trademark "Gelish" and part
of Plaintiffs' registered mark "Hand & Nail Harmony."  (*See* Trademark Registrations 1-4.)  Thus,
while the Domain Name is not identical to any of the Harmony Marks, because it is closely related
to the Harmony Marks and incorporates two of Plaintiffs' Registered Trademarks, (Malynn Decl.
¶ 4), which themselves are frequently used by Plaintiffs in close proximity to one another, (*see*
Haile ¶ 6), the Court finds that the Harmony Marks and Defendants' Domain Name are confusingly
similar.  *See N. Light Tech.,* 97 F. Supp. 2d at 117.

### iii.   <u>Bad Faith Intent</u>

As indicated, Congress identified nine non-exclusive factors to aid courts in determining whether
an alleged cybersquatter has acted in bad faith.  *See* 15 U.S.C. § 1125(d)(1)(B)(i).  Here, Plaintiffs
argue that "enumerated factors (I)-(III), (V), and (VIII) are highly indicative of Defendants' bad faith
intent."  (Mem. 18.)  Those factors are:

> (I) [T]he trademark or other intellectual property rights of the person, if any, in the
> domain name;
> (II) the extent to which the domain name consists of the legal name of the person
> or a name that is otherwise commonly used to identify that person;
> (III) the person's prior use, if any, of the domain name in connection with the bona
> fide offering of any goods or services; . . .

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**
**UNDER SEAL**

**CASE NO.:** <u>CV 15-02718 SJO (AJWx)</u>        **DATE:** <u>May 6, 2015</u>

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark . . . for commercial gain . . . by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; . . .
(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties[.]

15 U.S.C. § 1125(d)(1)(B)(i).  The Court examines each of those factors below.

Factor (I), which examines the alleged cybersquatter's trademark or other intellectual property rights in the domain name, *see* 15 U.S.C. § 1125(d)(1)(B)(i)(I), supports a finding of bad faith intent on the part of Defendants because Plaintiffs are the only owners and licensors of the Harmony Marks.  (Haile Decl. ¶¶ 4-5.)  Factor (II) also suggests bad faith because the Domain Name www.HarmonyGelish.co.uk does not include any part of the name with which Defendants associate:  "Rockstar Nails."  *See* 15 U.S.C. § 1125(d)(1)(B)(i)(II).  (*See* Haile Decl. ¶¶ 16, 18; Malynn Decl. ¶ 2.)  With regard to Factor (III), which considers the alleged cybersquatter's prior use of the domain name in connection with the bona fide offering of goods or services, *see* 15 U.S.C. § 1125(d)(1)(B)(i)(III), further supports a finding of bad faith intent because the only sales resulting from Defendants' Domain Name appear to be unauthorized sales of Harmony Products.[10] (Haile Decl. ¶ 20; Malynn Decl. ¶¶ 2, 4.)  Factor (VIII), which looks at whether the alleged cybersquatter used misleading information when applying for the domain name, *see* 15 U.S.C. § 1125(d)(1)(B)(i)(VIII), also appears to favor a finding of bad faith intent because Defendants registered the Domain Name to the Bismarck Address even though neither Rockstar Nails nor International Nail Co. are organized under the laws of North Dakota or registered to do business in North Dakota.  (Malynn Decl. ¶ 6.)

Factor (V), which examines the alleged cyberquatter's "intent to divert consumers from the mark owner's online location" to the cybersquatter's domain name "for commercial gain" and in a way that "could harm the goodwill represented by the mark . . . by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the [allegedly infringing domain name]," 15 U.S.C. § 1125(d)(1)(B)(i)(V), also suggests bad faith on the part of Defendants.  Defendants, who are unaffiliated with Plaintiffs, are selling Harmony Products on their Domain Name and

---

[10] In his declaration, Malynn states that Defendants' Website does not appear to advertise or offer any nail care products apart from Harmony Products.  (Malynn Decl. ¶ 4.)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**
**UNDER SEAL**

**CASE NO.:**  **CV 15-02718 SJO (AJWx)**          **DATE:** **May 6, 2015**

deriving income from that sale.  (*See* Haile Decl. ¶¶ 16-18, 20; Fernandez Decl. ¶¶ 3-5.)  These unauthorized sales harm Plaintiffs' relationships with their authorized distributor and create a risk that the Harmony Products will be improperly applied by untrained, inexperienced persons, resulting in "a degradation of the quality and safety associated with the Gelish brand." (Mem. 18; *see* Haile Decl. ¶¶ 3, 9-10, 22-23; Malynn Decl. ¶ 4.)  Thus, it appears that Defendants' sale of Harmony Products via the subject Domain Name and Website is for commercial gain and could harm the goodwill associated with the Harmony Marks.  Specifically, Defendants could damage Plaintiffs' relationship with their authorized distributors, who are not permitted to sell Harmony Products online, (Haile Decl. ¶ 22), and increase the odds that consumers will perceive Harmony Products as poor quality, ineffective, or injurious.  *See* 15 U.S.C. § 1125(d)(1)(B)(i)(V).

Finally, Plaintiffs argue that Defendants' use of the Domain Name solely to reproduce Plaintiffs' copyrighted works, as well as advertise and sell Harmony Products, supports a finding of bad faith intent.  (Mem. 19; *see* Malynn Decl. ¶ 4.)   Courts have found that where "the only goods or services offered for sale on the website" appear to infringe upon the plaintiff's trademarks, such facts weigh in favor of finding bad faith intent.  *See, e.g., Audi AG v. D'Amato,* 381 F. Supp. 2d 644, 666 (E.D. Mich. 2005).  Thus, Plaintiffs have demonstrated that Defendants are using the Domain Name in bad faith.  Based on the foregoing, the Court finds that Plaintiffs are likely to succeed on the merits of their cybersquatting claim.  *See Munaf,* 553 U.S. at 676.

///

c.    Trademark Infringement

Here, Plaintiffs' Complaint alleges a complaint for trademark infringement under section 32 of the Lanham Act ("Section 32").  (Compl. ¶¶ 70-76.)  "Section 32 . . . provides the registered owner of a trademark with an action against anyone who without consent uses a 'reproduction, counterfeit, copy, or colorable imitation' of the mark in such a way that 'is likely to cause confusion or to cause mistake, or to deceive.'" *Enesco Corp. v. Price/Costco Inc.,* 146 F.3d 1083, 1085 (9th Cir. 1998) (quoting 15 U.S.C. § 1114(1)) (footnote omitted).  "To establish a trademark infringement claim under [Section 32] . . . [the plaintiff] must establish that [the defendant] is using a mark confusingly similar to a valid, protectable trademark of [the plaintiff's]." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.,* 174 F.3d 1036, 1046 (9th Cir. 1999) (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979)) (footnote omitted).

As indicated above, because several of the Harmony Marks are registered with the PTO, (*see generally* Trademark Registrations), Plaintiffs have made a prima facie showing that they have a

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**
**UNDER SEAL**

**CASE NO.:** CV 15-02718 SJO (AJWx)          **DATE:** May 6, 2015

valid, protectable interest in the registered Harmony Marks.[11]  *See Applied Info. Serv. Corp. v. eBay, Inc.,* 511 F.3d 966, 970 (9th Cir. 2007) (footnote omitted).  Thus, the Court next examines whether Defendants have used the Harmony Marks in a way that is likely to cause confuse or mistake, or to deceive.  *See Enesco,* 146 F.3d at 1085.

As a general matter, "[a] trademark owner's right under the Lanham Act to control distribution of its own products is limited by the 'first sale' doctrine."  *Id.* (citing *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.,* 53 F.3d 1073, 1074 (9th Cir. 1995)).  Under the "first sale" doctrine, "resale by the first purchaser of the original article under the producer's trademark is generally neither trademark infringement nor unfair competition," because "trademark law is designed to prevent sellers from confusing or deceiving consumers about the origin or make of a product," and such "confusion ordinarily does not exist when a genuine article bearing a true mark is sold."  *Enesco,* 146 F.3d at 1085 (citations and quotation marks omitted).  Courts, however, recognize a "quality control" exception to the first sale doctrine where "'[d]istribution of a product that does not meet the trademark holder's quality control standards may result in the devaluation of the mark by tarnishing its image.'"  *Id.* at 1087 (citing *Warner-Lambert Co. v. Northside Dev. Corp.,* 86 F.3d 3, 6 (2d Cir. 1996); *El Greco Leather Prods. Co., Inc. v. Shoe World, Inc.,* 806 F.2d 392, 395 (2d Cir. 1986)).  This theory exists because "[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark."  *El Greco,* 806 F.2d at 395.  Thus, if a defendant is distributing the trademark holder's goods in a way that does not meet the trademark holder's quality control standards, and such conduct may devalue the mark by tarnishing its image, "the non-conforming product is deemed for Lanham Act purposes not to be the genuine product of the holder, and its distribution constitutes trademark infringement."  *Warner-Lambert,* 86 F.3d at 6; *Enesco,* 146 F.3d at 1085.  Plaintiffs argue that, under the particular circumstances of this case, the quality control exception to the first sale doctrine applies.  (Mem. 20.)  The Court agrees.

Harmony has shown that it takes special care to assure the quality of the Harmony Products by selling them directly to professional boutiques and salons through its qualified distributors.  (Haile Decl. ¶¶ 3, 8.)  Limiting its sales to these networks "is important to help ensure that the Gelish brand products are applied and removed properly," and to avoid the risk of marred finishes or even injury associated with improper applications by inexperienced or unqualified persons.  (Haile Decl. ¶¶ 3, 9-10.)  To assure the proper use of its products, Harmony does not sell its products over the internet, and its distributors are prohibited from selling Harmony Products to unauthorized distributors, re-distributors, or diverters.  (Haile Decl. ¶ 10.)  By contrast, Defendants sell allegedly

---

[11]  Importantly, "[a] registered trademark holder's protectable interest is limited to those goods or services described in its registration."  *eBay,* 511 F.3d at 970 (citations omitted).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**
**UNDER SEAL**

**CASE NO.:**  **CV 15-02718 SJO (AJWx)**          **DATE:**  **May 6, 2015**

infringing Merchandise on the Website and remove the batch codes Plaintiffs have laser-etched onto their products.  (Haile Decl. ¶¶ 18, 20; Malynn Decl. ¶¶ 2, 4, 8.)  The obliteration of Plaintiffs' batch codes, in turn, undermines Plaintiffs' ability to determine the source of Defendants' Merchandise and thereby thwarts Plaintiffs' efforts to assure quality control by managing the networks through which consumers can acquire Harmony Products.  (Haile Decl. ¶ 20; Malynn Decl. ¶ 8.)  Based on the foregoing, the Court finds that the quality control exception to the first sale doctrine applies to Defendants' sale of the Merchandise, *see Warner-Lambert,* 86 F.3d at 6, and Plaintiffs are likely to succeed on the merits of their trademark infringement claim.  *See Munaf,* 553 U.S. at 676.

d.    Unfair Competition under the UCL

The UCL's scope is "broad," *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.,* 20 Cal. 4th 163, 180 (1999), and its provisions prohibit "unfair competition" in the form of "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code §§ 17200, *et seq.*  Further, "[b]ecause section 17200's definition is 'disjunctive,' the statute is violated where a defendant's act or practice is unlawful, unfair, [or] fraudulent."  *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.,* 72 Cal. App. 4th 861, 878 (1999) (citation omitted); *see also Perea v. Walgreen Co.,* 939 F. Supp. 2d 1026, 1040 (C.D. Cal. 2013) ("Each prong of the UCL is a separate and distinct theory of liability.") (citation and footnote omitted).  "By proscribing any unlawful business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the [UCL] makes independently actionable."  *Cel-Tech,* 20 Cal. 4th at 180 (citation and quotation marks omitted).

Here, the Court has found that Plaintiffs are likely to succeed on their copyright infringement, cybersquatting, and trademark infringement claims.  Because Plaintiffs have shown that Defendants' conduct likely violates the Copyright and Lanham Acts, the UCL makes these unlawful practices independently actionable.  *See Cel-Tech,* 20 Cal. 4th at 180.  Thus, the Court finds that Plaintiffs are likely to succeed on the merits of their UCL claim.  *See Munaf,* 553 U.S. at 676.

2.    Likelihood of Irreparable Harm

With regard to irreparable harm, Plaintiffs argue that "[w]here a plaintiff demonstrates a substantial likelihood of success on the merits of an infringement action, as is the case here, the plaintiff will normally be presumed to suffer irreparable injury and be entitled to preliminary injunctive relief."

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**


**CIVIL MINUTES - GENERAL**
**UNDER SEAL**


**CASE NO.:**  __CV 15-02718 SJO (AJWx)__          **DATE:** __May 6, 2015__


(Mem. 21.)[12]  Although the Ninth Circuit once held that "[i]rreparable injury is ordinarily presumed upon a showing of a likelihood of success" in the trademark infringement context, *Abercrombie & Fitch Co. v. Moose Creek, Inc.,* 486 F.3d 629, 633 (9th Cir. 2007), in the wake of *Winter,* the Ninth Circuit has concluded that the likelihood of irreparable harm must be shown by Plaintiffs, not merely presumed by the Court.  *See Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.,* 736 F.3d 1239, 1249 (9th Cir. 2013).  This is true whether Plaintiffs are seeking an injunction pursuant to their copyright or trademark infringement claims.  *See id.*; *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.,* 654 F.3d 989, 998 (9th Cir. 2011).

For the following reasons, the Court finds that Plaintiffs have shown that, absent injunctive relief, irreparable harm is likely.  First, with regard to their trademark infringement claim, "[e]vidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm."  *Herb Reed,* 736 F.3d at 1249 (citing *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.,* 240 F.3d 832, 841 (9th Cir. 2001)).  Here, Plaintiffs have presented evidence that they use their distribution agreements to carefully control the sale of Harmony Products and assure that only boutiques, salons, and licensed cosmetologists sell, apply, and remove their gel polish.  (Haile Decl. ¶¶ 3, 9, 10.)  In order to assure the proper use of its products, Harmony does not engage in online sales despite marketing its products via the Internet.  (Haile Decl. ¶¶ 10-12.)  Although Harmony has not presented evidence of harm to its goodwill with customers, its President's declaration stating that authorized distributors have complained about the online sale of the allegedly infringing Merchandise evinces a likelihood that Harmony's relationships with its authorized distributors, and its distribution network generally, will be damaged by Defendants' activities.  (Haile Decl. ¶¶ 1, 22-23.)

Further, in the copyright context, "where it will be impossible to collect an award for past and/or future infringements perpetrated by a defendant," courts have found that the likelihood of irreparable harm warrants injunctive relief.  *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,* 518 F. Supp. 2d 1197, 1217 (C.D. Cal. 2007); *see also Lava Records LLC v. Ates,* No. CV 05-01314 JJ, 2006 WL 1914166, at *3 (W.D. La. July 11, 2006) (finding that "the need to prevent irreparable harm to Plaintiffs, which will not be remedied by a damage award that may or may not be collectible," in part, warranted injunctive relief).  Here, Defendants have endeavored to prevent Plaintiffs from discovering their identities by obliterating the batch codes from Plaintiffs' products, (Haile Decl. ¶ 21; Malynn Decl. ¶ 8), and registering the Website's Domain Name to a Bismarck Address despite that neither Rockstar Nails nor International Nail Co. are registered as North

---

[12]  Plaintiffs are advised that, by contrast with the Local Rule, *see* L.R. 11-6, this Court's Initial Standing Order ("ISO") provides that "no memorandum [of] point and authorities or opposition may exceed twenty pages."  (*See* ISO ¶ 21 (last revised Oct. 15, 2013).)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**
**UNDER SEAL**

**CASE NO.:** **CV 15-02718 SJO (AJWx)**          **DATE:** **May 6, 2015**

Dakota business entities.  (Malynn Decl. ¶ 6.)  Defendants' efforts to mask their activities have necessitated that Plaintiffs retain an Investigator in order to discern Rockstar's identity and location, (*see* Haile Decl. ¶ 19; Fernandez Decl. ¶¶ 1-5; Malynn Decl. ¶¶ 7, 10), and, absent injunctive relief, Defendants may abscond with the proceeds derived from their infringing activities by transferring their online business and accounts outside of this Court's jurisdiction.  (Malynn Decl. ¶ 11.)

Overall, "[t]he underlying purpose of a TRO is to preserve the status quo and prevent irreparable harm before a preliminary injunction hearing may be held." *Jones v. H.S.B.C. (USA),* 844 F. Supp. 2d 1099, 1100 (S.D. Cal. 2012) (citing *Granny Goose Foods,* 415 U.S. at 439).  Because allowing Defendants to transfer the Website and proceeds derived therefrom outside of this Court's jurisdiction prior to a preliminary injunction hearing would limit, if not nullify this Court's ability to make Plaintiffs whole via a damages award, the Court finds that Plaintiffs have shown a likelihood of irreparable harm.  *See Grokster, Ltd.,* 518 F. Supp. 2d at 1217; *Lava Records*, 2006 WL 1914166, at *3.

      3.    Balance of the Equities

In balancing equities between parties, the Court must weigh the effect of harm to either party. *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) ("The assignment of weight to particular harms is a matter for district courts to decide.").  The Court also examines the degree to which parties have acted in good faith and whether the moving party's need for an injunction is self-imposed.

Here, Plaintiffs argue that although they will likely suffer irreparable harm absent injunctive relief, Defendants will either suffer:  (1) no injury, because they lack a cognizable legal interest in the Domain Name and Plaintiffs' Marks and Works, (Haile Decl. ¶¶ 4-5, 14, 16; Malynn Decl. ¶ 2-4); or (2)  "limited, purely monetary" injury as the result of the Court temporarily freezing their assets and use of the Domain Name.  (Mem. 22.)  The Court agrees.  Because:  (1)  the Court has found that Plaintiffs are likely to suffer irreparable harm absent injunctive relief; and (2) any TRO issued without notice must expire within 14 days of the date on which it is issued, Fed. R. Civ. P. 65(b)(2), the Court finds that any injury Defendants may suffer if they are wrongfully enjoined is likely to be temporary and monetary in nature.  Thus, the Court finds that the balance of the equities favors Plaintiffs.

      4.    Public Interest Considerations

Finally, in determining whether to grant an application requesting injunctive relief, the Court considers the effect of an injunction on the public at large.  In making this determination, the Court

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**
**UNDER SEAL**

**CASE NO.:** CV 15-02718 SJO (AJWx)          **DATE:** May 6, 2015

"primarily addresses impact on non-parties rather than parties." *Sammartano v. First Judicial Dist. Ct., in & for Cnty. of Carson City*, 303 F.3d 959, 974 (9th Cir. 2002) (abrogated on other grounds by *Winter,* 555 U.S. at 24). Because the public interest favors protecting trademarks and copyrights against infringement, *see Brookfield,* 174 F.3d at 1066; *Grokster,* 518 F. Supp. 2d at 1222, the Court finds that the public interest weighs against granting injunctive relief.

     5.    <u>TRO Conclusion</u>

For the aforementioned reasons, the Court finds that Plaintiffs have shown that they are (1) likely to succeed on the merits of their claims; (2) likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips their favor; and (4) that an injunction is in the public interest. *See Winter,* 555 U.S. 7, 20. Further, courts are empowered to freeze a defendant's assets in order to assure that the possibility that the plaintiff may be awarded equitable relief, including lost profits. *See Reebok,* 970 F.2d at 559; *Roederer v. Treister,* 2 F. Supp. 3d 1153, 1163 (D. Or. 2014) ("[A] Court has the power to issue a preliminary injunction in order to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies") (citation omitted).

Accordingly, the Court **GRANTS** the Application.[13]

///
///

     D.    <u>Bond</u>

Rule 65 provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "The amount of security is within the Court's discretion and turns on the facts of a particular case." *Roederer,* 2 F. Supp. 3d at 1163 (citing *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)).

Here, Plaintiffs request that the Court "require it to post a minimal bond subject to increase based on proof of the restrained funds." (Mem. 23.) Such an approach is sensible in light of the uncertainty regarding the amount of the restrained funds that will be subject to the Court's TRO

---

[13] The parameters of the injunctive relief granted by this Order are included in the Court's accompanying TRO Order.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**
**UNDER SEAL**

**CASE NO.:   CV 15-02718 SJO (AJWx)          DATE:  May 6, 2015**

and Plaintiffs' own admission that Defendants may suffer a monetary injury if wrongfully enjoined. (*See* Mem. 22.)  Accordingly, Plaintiffs **must post a bond of $20,000.00** with the Clerk of the Court, subject to increase based on proof of the amount of the restrained funds.

E.     Alternative Service

Finally, Plaintiffs request that the Court grant them leave to serve copies of the documents associated with the Plaintiffs' Application and Complaint, including any Court Order ("Documents"), on Defendants by mailing and emailing these Documents to the Bismarck and Santa Monica Addresses, as well as an email address shown to be associated with Defendants: DevAntMarketing@gmail.com.  (*See* Mem. 23; Proposed Order 5.)

Generally, Rule 4 of the Federal Rules of Civil Procedure ("Rule 4") governs  service of process and "email service is not available absent a Rule 4(f)(3) court decree."  *JBR, Inc. v. Café Don Paco, Inc.,* No. CV 12-02377 NC, 2013 WL 1891386, at *6 (N.D. Cal. May 6, 2013) (citation omitted).  However, "[u]nder certain circumstances, courts have allowed service by e-mail and have found that it was the most likely method to reach defendants."  *Chanel, Inc. v. Zhixian,* No. CV 10-60585 JIC, 2010 WL 1740695, at *3 (S.D. Fla. Apr. 29, 2010) (collecting cases).  Such circumstances include instances the defendant is "playing hide-and-seek with the federal court [and] e-mail may be the only means of effecting service of process."  *Rio Props., Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1018 (9th Cir. 2002).  Overall, "[c]onstitutional due process requires only that service of process provide 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"  *Chanel, Inc. v. Zhixian,* No. CV 10-60585 JIC, 2010 WL 1740695, at *3 (S.D. Fla. Apr. 29, 2010) (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *Prewitt Enters., Inc. v. Org. of Petroleum Exporting Countries*, 353 F.3d 916, 921 (11th Cir. 2003), and "Rule 4 is a flexible rule that should be liberally construed so long as a party receives sufficient notice of the complaint."  *United Food & Commercial Workers Union v. Alpha Beta Co.,* 736 F.2d 1371, 1382 (9th Cir. 1984).

Because Defendants' identities and location are unknown, and Defendants appear to have made considerable efforts to inhibit Plaintiffs' ability to find them, (*see* Haile Decl. ¶¶ 17, 20; Malynn Decl. ¶¶ 5-6, 10), the Court finds that service of process via email is reasonably calculated to alert Defendants of the pendency of this litigation and afford Defendants the opportunity to appear and present their objections.  *See Mullane*, 339 U.S. at 314.  Further, because California law permits service of process via a mailing to the defendant's post office box where his whereabouts are unknown, *see Transamerica Title Ins. Co. v. Hendrix,* 34 Cal. App .4th 740, 744-45 (1995), such service is permissible under Rule 4.  *See* Fed. R. Civ. P. 4(e) (providing that an individual may be served by "following state law for serving a summons in an action brought in courts of general

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**
**UNDER SEAL**

**CASE NO.:**  <u>CV 15-02718 SJO (AJWx)</u>          **DATE:**  <u>May 6, 2015</u>

jurisdiction in the state where the district court is located or where service is made").[14]  For the aforementioned reasons, the Court grants Plaintiffs leave to serve the Documents on Defendants using the alternative means provided in this Court's accompanying Order.[15]

III.    <u>RULING</u>

For the foregoing reasons, the Court **GRANTS** the Application.

IT IS SO ORDERED.

---

[14]  The Lanham Act, which allows a plaintiff to "send[] notice of [an] alleged violation [of the act's cybersquatting provisions] and intent to proceed [with an in rem civil action against the domain name] to the registrant of the domain name at the postal and e-mail address provided by the registrant to the registrar" if the individual cannot be found through due diligence, 15 U.S.C. § 1125(d)(2)(A)(ii)(II)(aa), supports this conclusion.

[15]  The accompanying Order also specifies the parameters of the injunctive relief granted by this Court.